UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

THOMAS SIMCOE,

                Plaintiff,

      -vs-

LIEUTENANT TIMOTHY GRAY NTPD, OFFICER
JEFFREY SMITH NTPD, and OFFICER KEITH
GLASS NTPD,

                Defendants.

**DECISION AND ORDER**
**No. 6:10-CV-6531(MAT)**

---

## I.   Introduction

Pro se plaintiff Thomas Simcoe ("Simcoe" or "Plaintiff") instituted this action pursuant to 42 U.S.C. § 1983 against Defendants, all employees of the North Tonawanda Police Department ("NTPD"), alleging that they used excessive force in executing his arrest and thereby violated his constitutional rights. Defendants have moved for summary judgment, and Plaintiff has opposed this motion. For the reasons set forth below, the Court finds that all Defendants are entitled to qualified immunity with regard to Plaintiff's excessive force claims. Accordingly, Defendants' summary judgment motion is granted, and Plaintiff's complaint is dismissed.

## II. Factual Background and Procedural History

On September 29, 2007, a call was placed to 911 at about 4:24 a.m. by Plaintiff's minor son ("T.M.S.") regarding a domestic violence incident at his home at 41 Courtside Drive in North

Tonawanda. Lieutenant Timothy Gray ("Lt. Gray") and Officer Jeffrey Smith ("Officer Smith") responded the call. They approached the back door of the apartment, and knocked and announced their presence. No one answered the door.

Officer Keith Glass ("Officer Glass") arrived soon thereafter, and he and Officer Smith attempted to gain entry to the apartment via the front door. The police dispatcher alerted the officers that there was an individual with a prior mental health history at the residence. (Plaintiff had recently attempted suicide.).

Plaintiff's minor son, T.M.S., appeared in an upstairs window and told the officers that his father had hit his mother, and that he had locked himself in his room. T.M.S. stated that he could not come to the front door to let them in, because he was afraid his father would hurt him if he did so. T.M.S. told the officers that Plaintiff was on the other side of the door, and that his mother, Tracy Simcoe ("Mrs. Simcoe") was lying on the floor and moaning.

The officers proceeded to draw their weapons and kick in the door. Inside, they saw blood spattered everywhere. Mrs. Simcoe was lying on the floor motionless and unresponsive. TMS and another child were still upstairs. Plaintiff admitted at his deposition that he and his wife had been in a brutal fight that evening, and that he had "lost control", going from "homicidal" to "suicidal". Plaintiff testified at his criminal trial that he never regained control of himself that night.

According to Plaintiff, Mrs. Simcoe had stabbed him with a knife between his eyes and in his left shoulder. The weapon in question had a blade approximately six inches long. During their argument, Plaintiff slammed his wife's head against the floor so hard that her skull separated. In grabbing the knife by the blade, Plaintiff severed a tendon in his left hand. However, the two continued struggling, and Plaintiff began biting Mrs. Simcoe. When Mrs. Simcoe tried to get the knife away from him, Plaintiff testified at his deposition that he "lost control, pulled that rope out, put it around her neck and choked the shit out of her" until she lost consciousness. See Deposition of Thomas Simcoe "Simcoe Dep." at 93-94, Exhibit F to Defendants' Local Rule 56 Statement of Undisputed Material Facts ("Defs' Ex."). It was at that moment when Simcoe heard the police officers begin hammering on the door.

Upon hearing the police trying to enter the house, Plaintiff turned off the lights, picked up the knife, and moved toward the kitchen. Hiding himself in a little gap between a cabinet and the doorway that led from the kitchen to the back laundry room, Plaintiff stood with his back perpendicular to the kitchen wall. Plaintiff's intention was to commit "suicide by cop". Simcoe Dep. at 95-96. Plaintiff was covered in blood and still bleeding from several knife wounds he sustained in the fight with his wife.

When the officers entered the apartment, all the lights were off, with the only illumination coming from the street-lamps

outside. Officer Smith walked by Plaintiff, who followed him into the laundry room adjacent to the kitchen. Plaintiff took a couple steps inside the room and shouted, "Shoot me, mother fucker!" E.g., Simcoe Dep. at 50, 58, 79-81, 122.

Officer Smith turned around to face Plaintiff, who was holding the knife with the blade pointed towards him (Officer Smith). Plaintiff ignored Officer Smith's repeated orders to drop the knife and get down on the ground. According to Officer Smith, Plaintiff charged forward with the knife in his hand, yelling in a bellicose, threatening manner. Although Plaintiff denies rushing at Officer Smith, he admits that he followed him into the next room while still holding the knife in his hand.

Upon seeing Plaintiff coming towards him with a knife, Officer Smith attempted to gain control of Plaintiff and bring him to the ground. First, however, Officer Smith threw his weapon out of Plaintiff's reach. He was concerned that the gun could go off accidentally and injury the apartment's other occupants, or that Plaintiff would gain control of the gun.

When Lt. Gray heard Officer Glass yelling "knife," he began to kick in the back door. As he entered the apartment, he immediately saw Officer Smith and Plaintiff struggling. By the light of his Taser gun, Lt. Gray could see that Plaintiff was holding a knife

above Officer Smith's head. According to Lt. Gray, Plaintiff stabbed at Officer Smith's chest area at least three times.[1]

Plaintiff again ignored the officers' commands to stop resisting arrest and to get down on the floor. Officer Glass attempted to use his Taser to subdue Plaintiff, but he could not get a clear shot since Plaintiff and Officer Smith remained locked in a struggle. After being Tased, Plaintiff finally dropped the knife and fell, face-first, to the floor. Because he had been stunned, he was unable to break his fall with his hands. Plaintiff fell towards Lt. Gray, who saw the front side of Plaintiff's body, including his face, hit the floor. Plaintiff partially landed on Officer Smith, who sustained injuries to his knee and ankle, and received a bump on the head. Officer Glass kicked Plaintiff's knife away, into the other room.

Once on the ground, Plaintiff continued to struggle with Officers Smith and Glass. Because Plaintiff refused to comply with the officers' commands, they began "yanking and pulling" on his arms and yelling for him to give them his hands. In order to hold Plaintiff down so the other officers could free his arms and handcuff him, Lt. Gray kneeled on Plaintiff's shoulders. Plaintiff has admitted that it was "a possibility" that he began biting or

---

[1]

Plaintiff denied trying to stab Officer Smith, claiming that Officer Smith impaled himself on Plaintiff's knife three times. E.g., Simcoe Dep. at 58.

chewing on Lt. Gray's boot during the struggle. Simcoe Dep. at 129-30.[2]

By the time Plaintiff was handcuffed, the fire department had arrived. Lt. Gray notified them that a second ambulance was needed because Plaintiff had injuries to his upper body and was profusely bleeding from his face. Immediately after handcuffing Plaintiff, Officer Glass turned the lights on, and the officers saw that they all were covered in blood. Officer Smith also appeared to have "chunks" of skin or muscle hanging off of him. Simcoe Dep. at 78.

Believing that Officer Smith had been stabbed, Officer Glass and Lt. Gray first attempted to ensure that he did not "bleed out". The officers placed Officer Smith in a chair in the kitchen where Lt. Gray checked Officer Smith's shirt. Noticing that it had been sliced by Plaintiff's knife-blade, Lt. Gray removed the shirt to see if the knife had gone through Officer Smith's vest. One of the firefighters also examined Officer Smith to see if he had sustained a stab wound from Plaintiff's knife.

Once Officer Smith left the laundry room where the altercation had occurred with Plaintiff, he did not go back into that room. Officer Smith was then taken to the hospital by NTPD Officer Mang, who had arrived as back-up.

---

[2]
At his criminal trial, Plaintiff testified that after being Tased and falling to the ground, he only recalls being handcuffed "and that was about it;" because he "was kind of out of [his] mind . . . [he] didn't know what was going on." Trial Testimony of Thomas Simcoe at 1515, Defs' Ex. G.

Observing that Officer Smith was in shock but not in acute danger, Officer Glass ran out to the living room where he found Plaintiff's children screaming in distress. Officer Glass also tended to Mrs. Simcoe, who, by that time, had been moved to the porch. Officer Glass did not see Plaintiff again after Plaintiff had been restrained.

After his arrest but before his indictment, Plaintiff wrote a letter dated October 13, 2007, to Officer Smith, apologizing for his actions on the night of the incident. See Letter from Plaintiff to Officer Jeffrey Smith, October 13, 2007, Defs' Ex. K. Plaintiff's letter, which expressed apologies to the entire NTPD, contained no mention of excessive force by any of the responding officers.

On November 1, 2007, Plaintiff was indicted by a Grand Jury on numerous counts, including first and second degree attempted murder of Mrs. Simcoe and Officer Smith. It was not until after his indictment that Plaintiff began making allegations of excessive force against the NTPD officers involved in his arrest. See Letter from Plaintiff dated January 8, 2008, Defs' Ex. L.

At Plaintiff's bench trial, which commenced on September 8, 2009, Judge Sarah Sperazza determined that not only had Plaintiff intended to kill his wife that evening, but he also intended to kill his wife's alleged paramour. Furthermore, based upon the testimony from the medical examiner, the judge found that had

Officer Smith not been wearing his armor, along with a cell phone and notepad in his chest pockets, he also would have been killed, "based on the size of the knife and the thrusts of the knife." Sentencing Transcript at 36.

Judge Sperazza found Plaintiff guilty on all eleven counts, including second degree attempted murder of Mrs. Simcoe and first degree attempted murder of Officer Smith. Plaintiff was sentenced to consecutive terms of twenty-five years to life for the attempted second degree murder of Mrs. Simcoe and thirty years to life for the first degree attempted murder of Officer Smith.

On September 17, 2010, Plaintiff filed his complaint ("Compl.") (Dkt #1) in this Court. Specifically, Plaintiff claims that after he was handcuffed, Lt. Gray grabbed him by the back of his head and slammed his face into the concrete floor, breaking his nose.[3] Then, according to Plaintiff, Lt. Gray stood "on top of [his] handcuffed hands rocking his full weight back and forth causing damage" to his right bicep and shoulder Compl., p. 5 (Dkt #1). Plaintiff also alleges that Officers Smith and Glass failed to intervene and stop Lt. Gray from using excessive force against him. Plaintiff does not contend that the use of the Taser

---

[3]

Plaintiff's fractured nose was repaired at the hospital after the incident. He has not sought any further medical care in regard to his nose. Plaintiff also claims that his right bicep muscle was detached during the struggle with the officers. He saw a specialist but was not recommended for surgery.

-8-

constituted excessive force. Simcoe Dep. at 126. Plaintiff seeks compensatory as well as punitive damages.

Defendants have moved for summary judgment, arguing that there are no genuine issues of material fact for trial, and that they are entitled to qualified immunity. Plaintiff has opposed the motion, asserting that the record is replete with material issues of fact precluding summary judgment.

## III. Applicable Principles of Constitutional Law

### A.   Section 1983

Plaintiff bases his constitutional claims on 42 U.S.C. § 1983, which reads in part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom or usage of any State . . . , subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action.

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144, n. 3 (1979)).

### B.   Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see generally, e.g., Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Celotex Corp., 477 U.S. at 324.

If the movant meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Id. at 331; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing 10A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93-95 (1983)). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 323. The moving party thus is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. Id.

The nonmoving party must produce "significant probative evidence" demonstrating that a material factual dispute does in fact exist; otherwise, summary judgment is appropriate. Anderson, 477 U.S. at 249 (citation omitted). In order to establish a

-10-

material issue of fact, the nonmovant need only provide "sufficient evidence supporting the claimed factual dispute" such that a "jury or judge [is required] to resolve the parties' differing versions of the truth at trial." Id. at 248-49 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U .S. at 587 (quoting FED. R. CIV. P. 56(e) advisory committee's note on 1963 amendments).

## IV.  Discussion

### A.  Qualified Immunity

The doctrine of qualified immunity shields public officials "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also, e.g., Munafo v. Metro. Transp. Auth., 285 F.3d 201, 210 (2d Cir. 2002). As with an absolute immunity, qualified immunity "is effectively lost if a case is erroneously permitted to go to trial[,]" Saucier v. Katz, 533 U.S. 194, 200-01 (2001), overruled on other grounds by Pearson v. Callahan, ___ U.S. ____, 129 S. Ct. 808, 172 L. Ed.2d 565 (2009).  Thus, the Supreme Court repeatedly has stressed the

"importance of resolving immunity questions at the earliest possible stage in litigation." Id. (quotation omitted).

Following the Supreme Court's decision in Pearson, 129 S. Ct. at 818, holding that Saucier's two-step inquiry was not mandatory, the courts are no longer required to determine whether a plaintiff's constitutional rights were violated if it determines that it was objectively reasonable for the police officers to believe that their actions did not violate those rights.

To determine if the constitutional right was clearly established at the time of the alleged constitutional violation, the court must focus on "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "Resolution of this inquiry is purely legal in that it depends upon whether the law put the officer on notice that his conduct would be clearly unlawful." Cowan ex rel. Estate of Cooper v. Breen, 352 F.3d 756, (2d Cir. 2003) (citing Saucier, 533 U.S. at 202; Stephenson v. Doe, 332 F.3d 68, 80-81 (2d Cir. 2003) ("[T]he ultimate legal determination of whether qualified immunity attaches to a law enforcement agent's actions is 'a question of law better left for the court to decide.'") (quoting Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir. 1990)).

Although the inquiry into whether it was "objectively reasonable" for the officer to believe that his actions were lawful

at the relevant time requires a focus on the particular facts of
the case, the Second Circuit has held that a defendant is entitled
to summary judgment on qualified immunity grounds when

> "no reasonable jury, looking at the evidence in the light
> most favorable to, and drawing all inferences most
> favorable to, the plaintiffs, could conclude that it was
> objectively unreasonable for the defendant[ ]" to believe
> that he was acting in a fashion that did not clearly
> violate an established federally protected right.

Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987) (quoting Halperin
v. Kissinger, 807 F.2d 180, 189 (D.C. Cir. 1986)); accord Lennon v.
Miller, 66 F.3d 416, 420 (2d Cir. 1995); Wachtler v. County of
Herkimer, 35 F.3d 77, 80 (2d Cir. 1994) (same).  "An officer's
actions are objectively unreasonable when no officer of reasonable
competence could have made the same choice in similar
circumstances." Lennon, 66 F.3d at 420-21 (citing Malley v. Briggs,
475 U.S. 335, 341 (1986)). If the court determines that the only
conclusion a rational jury could reach is that reasonable officers
would disagree about the legality of the defendants' conduct under
the circumstances, summary judgment for the defendants-officers is
appropriate. Id.

### B.   Excessive Force

The Court first must determine whether Defendants were
objectively reasonable in believing that their actions did not
violate Plaintiff's constitutional right to be free from the use of
excessive force. Where an excessive force claim "arises in the
context of an arrest or investigatory stop of a free citizen, it is

-13-

most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." Graham v. Connor, 490 U.S. 386, 393-94 (1989). Thus, claims that law enforcement officers have used excessive force when arresting a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" principles. Id. ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.") (citing, inter alia, Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir.) cert. denied, 414 U.S. 1033 (1973)). "Determining whether the force used during an arrest is 'reasonable' requires balancing the 'nature and quality of the intrusion on the individuals Fourth Amendment interests against the countervailing governmental interests at stake.'" Lennon, 66 F.3d at (quoting Graham, 490 U.S. at 396 (internal quotation marks and citations omitted in Lennon).

        As discussed further below, under the particular circumstances presented here, no rational jury could have found that the force used was so excessive that no reasonable officers would have made the same choices as did Lt. Gray, Officer Smith, and Officer Glass.

### 1.    Absence of Genuine Issues of Material Fact

Contrary to Plaintiff's assertions, none of the material facts are genuinely in dispute. Plaintiff insists that the NTPD framed him for the attempted murders of his wife and Officer Smith and, based upon this belief, has dissected the record in an attempt to create a genuine issue of material fact. For example, Plaintiff claims that his wife actually regained control of the knife during their fight; he disputes Officer Glass' testimony that he was "screaming like a madman" when the police officers discovered him in the apartment; and he deems incredible Officer Smith's testimony about why and where he threw his service weapon upon confronting Plaintiff. See also Defendants' Reply Memorandum of Law at 3-4.

On the other hand, there are numerous material facts which Plaintiff concedes. As Defendants point out, Plaintiff admits that he had brutal fight with his wife, during which he fought with her over a knife and strangled her until she was unconscious; intentionally turned off the lights in the apartment and refused to answer the door when the police arrived; was covered in blood and bleeding profusely from a stab wound to his forehead when the police encountered him; confronted Officer Smith while wielding a knife and demanding that Officer Smith shoot him so that he could commit "suicide by cop"; and later wrote a letter of apology to Officer Smith and the NTPD thanking them for not using deadly force against him. Upon these facts, the Court can say that Defendants'

beliefs about the legality of their actions were objectively reasonable, as discussed below.

### 2.    Objective Reasonableness

The reasonableness of the force used is assessed by considering the "totality of the circumstances faced by the officer on the scene." Id. (citing Graham, 490 U.S. at 396; Anderson v. Branen, 17 F.3d 552, 560 (2d Cir. 1994)). This inquiry, which "judge[s] from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," Graham, must include the following specific considerations: the severity of the crime at issue; "whether the suspect poses an immediate threat to the safety of the officers or others"; and "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

As to the first factor, the Second Circuit has repeatedly noted that "[d]omestic disputes tend to be 'combustible,'" Hodge v. City of Long Beach, 425 F. App'x 33, 34 (2d Cir. 2011) (quoting Tierney v. Davidson, 133 F.3d 189, 197 (2d Cir. 1998)). Thus, courts "have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger[,]" Tierney, 133 F.3d at 197 (citing Magnuson v. Cassarella, 813 F. Supp. 1321, 1323 (N.D. Ill. 1992) (finding that unannounced, warrantless entry into house was

justified by exigent circumstances of in-progress domestic disturbance)).

In Hodge, the Second Circuit reversed the district court's order denying summary judgment to police officers on an excessive force claim stemming from a "potential[ly] severe domestic crime" where the suspect refused to cooperate with police requests to remove his hands from his pockets and attempted to walk away from police. 425 F. App'x at 33-35. The plaintiff in Hodge alleged that the officers "spun him around with a forearm, grabbed his neck, put him in a bear hug, and pulled his arms behind his back as they attempted to handcuff him, causing injuries and bruises to his back, and abrasion on his arms and neck, and rendering him unable to swallow." Id. at 34-35 (citation and internal quotation marks omitted). However, the plaintiff acknowledged that the incident "happened quickly" and that he was never forced to the ground. Id. at 35 (citation and internal quotation marks omitted).

In determining that the plaintiff's right to be free of excessive force was not violated and that officers were entitled to qualified immunity, the Hodge panel noted that "because of the plaintiff's defiance and the indicia of a potential incident of domestic violence, it would not be 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier, 533 U.S. at 202).

Here, the circumstances facing the police officers responding to Plaintiff's apartment reflected much more than a "potential severe domestic crime[,]" Hodge, 425 F. App'x at 34. When the officers arrived, they found the house in complete darkness, and Plaintiff's son stated that his mother was unconscious and that he feared for his life at his father's hands if he answered the door. In addition, the police officers had been informed by dispatch that Plaintiff had previously attempted suicide. Once they gained entry, the officers saw that the apartment was covered in blood, and Plaintiff's wife was unconscious on the floor. The situation facing Defendants here was more grave than that facing the officers in Hodge 425 F. App'x at 34 (finding that the 911 call, the broken glass, and the plaintiff's torn and apparently blood-stained shirt reflected a "potential severe domestic crime"). The first factor thus strongly weighs in Defendants' favor.

The degree of threat posed by Plaintiff to the safety of the officers and the other family members also weighs heavily in Defendants' favor. When Officer Smith passed by the location where Plaintiff had concealed himself, Plaintiff jumped out, knife in hand, and began screaming, "Shoot me, mother fucker!" Plaintiff, by his own testimony, took at least two steps towards Officer Smith, and he refused the officer's repeated commands to drop the knife and get down on the ground. A reasonable officer certainly could have viewed Plaintiff's conduct as posing an immediate and grave

threat to his safety. See Hodge 425 F. App'x at 34 ("A reasonable officer could have viewed the plaintiff's continued refusals to remove his hands from his pockets as an immediate threat to the officer's safety."). Indeed, a heated fight ensued between Plaintiff and Officer Smith, during which Lt. Gray observed Plaintiff stabbing Officer Smith three times in the chest area. Plaintiff had to be Tased before he fell to the ground.

The third and final factor, whether Plaintiff was actively resisting arrest or attempting to flee, likewise favors Defendants' position. Even after being Tased and falling face-first on the floor, Plaintiff continued to struggle with the officers, refusing their commands to give them his hands so he could be cuffed. See Hodge, 425 F. App'x at 34 (finding that the third Graham factor favored police officers where the plaintiff "displayed defiant resistance, abruptly turning and walking away from the officers").

Based upon the fact that Plaintiff was wielding a knife, that he strenuously resisted the officers' attempts to subdue him and ultimately had to be Tased, and that the scene bore obvious signs of a serious domestic incident, it would be "clear to a reasonable officer that his conduct was [not] unlawful in the situation he confronted." Saucier, 533 U.S. at 202. Thus, the Court exercises its discretion under Pearson to first determine that Plaintiff's claimed Fourth Amendment right was not "clearly established" under these circumstances, Pearson, 129 S. Ct. at 818. Defendants

therefore are entitled as a matter of law to qualified immunity. See Hodge, 425 F. App'x at 35.  The Court also finds that the force used did not violate Plaintiff's Fourth Amendment rights.


**V. Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt #77) is granted, and the Complaint (Dkt #1) is dismissed is in its entirety. The Court hereby certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this Decision and Order would not be taken in good faith, and therefore denies leave to appeal in forma pauperis. The Clerk of the Court is requested to close the case.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:   Rochester, New York
         June 13, 2013